**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LIONEL ANDRÉS MESSI CUCCITTINI and LMGM, SLU, <br><br>     Plaintiffs, <br><br>   v. <br><br> THE INDIVIDUALS, CORPORATIONS, LIMITED LIABILITY COMPANIES, PARTNERSHIPS, AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE A, <br><br>     Defendants. | Case No. 26-cv-02468 |

**DECLARATION OF DOMINIK FOURNÉ**

I, Dominik Fourné, declare and state as follows:

1.      This declaration is based upon my personal knowledge of the facts stated herein or on business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

2.      I make this declaration in support of Plaintiffs' application for entry of an Order to Show Cause with temporary restraints and other relief (the "Application").

3.      I am the Chief Financial Officer at LMGM, SLU ("LMGM") and am knowledgeable about or have access to business records concerning key aspects of the brand protection operation of the Plaintiffs, including, but not limited to, trademarks, other intellectual property, sales, on-line sales, advertising, marketing, media coverage, and associated international operations. I make this declaration from matters within my own knowledge unless stated otherwise.

1

4.        Plaintiff LIONEL ANDRÉS MESSI CUCCITTINI ("MESSI") owns all rights in, and LMGM is the exclusive assignee of, the trademark covered by U.S. Trademark Registration No. 4,948,078 (the "MESSI Trademark"). The registration and assignment are valid, subsisting, and in full force and effect. A true and correct copy of the certificate of registration for the MESSI Trademark is attached hereto as **Exhibit 1**.

5.        Plaintiff MESSI is an individual with dual Argentine and Spanish citizenship currently domiciled in the United States. Plaintiff LMGM is a sociedad limitada unipersonal organized under the laws of the Principality of Andorra with its principal place of business in Escaldes-Engordany, Andorra. LMGM is the exclusive assignee of certain intellectual property rights owned by MESSI, including the MESSI Trademark.

6.        MESSI is a world-famous soccer player and the most decorated soccer player in history, with 46 team trophies, including the 2022 World Cup.[1] Through MESSI's success and fame, he is consistently regarded as one of the greatest soccer players in the history of the sport, resulting in his personal brand exploding in popularity each year.[2] In 2025 alone, approximately 1.3 million of MESSI's jerseys were sold worldwide.[3] The Messi Store, which sells merchandise using the MESSI Trademark (the "MESSI Products"), recorded $1.69 million in revenue in 2023.[4]

---

[1] *After Messi's Newest Title: Top Five Most Decorated Players Ever — One of Them is Egyptian*, YAHOO SPORTS (Dec. 8, 2025), https://sports.yahoo.com/articles/messi-newest-title-top-five-194000567.html.

[2] *The 55 Greatest Soccer Players of All Time*, SPORTS ILLUSTRATED (Sep. 22, 2025), https://www.si.com/soccer/the-50-greatest-soccer-players-of-all-time; *Lionel Messi Leads MLS Best-Selling Jerseys in 2025*, MLS (June 18, 2025, 1:00 PM), https://www.mlssoccer.com/news/lionel-messi-leads-mls-best-selling-jerseys-in-2025.

[3] Daniel L. Peinado, *How Real Madrid Made Jersey Sales History in 2025*, DIARO AS (Dec. 19, 2025, 11:41 EST), https://en.as.com/soccer/how-real-madrid-made-jersey-sales-history-in-2025-f202512-n.

[4] Brendan Coffey, *Soccer Transfer: Messi Brand Sold to Pay Bills for Fashion Also-Ran*, SPORTICO (Apr. 5, 2025, 9:00 AM), https://www.sportico.com/business/commerce/2024/lionel-messi-brand-sale-1234773939.

The MESSI Products have acquired national and worldwide fame and recognition because of its uniquely recognizable design and association with MESSI.

7.      Indeed, MESSI's ability to boost sales and customer traction has been coined "The Messi Effect" and "Messi Mania," showcased when his transfer to Inter Miami CF increased the Miami-based soccer team's global Google searches by 1,200%, and searches for MESSI collectables—spanning trading cards and memorabilia—increased 75% globally on websites such as eBay.[5] Online retailer Soccer.com also noted it sold half a year's worth of MESSI-printed jerseys in just one day after his transfer.[6]

8.      In 2016, MESSI obtained the registration for the MESSI Trademark, which is used on products from his personal brand. The MESSI Trademark is a unique symbol borne on the MESSI Products, including, without limitation, sports apparel, footwear, athletic equipment, bags, electronics, accessories, and related lifestyle goods on the official Messi Store (www.themessistore.com) and Messi Fragrances (www.messifragrances.com), as well as on specialty and limited-edition products with brand partners such as Adidas and Stanley.

---

[5] Dan Hajducky, *The Messi Effect: New Miami Star Brings Business to MLS*, ESPN (Aug. 1, 2023, 10:59 AM ET), https://www.espn.com/soccer/story/_/id/38082893/the-messi-effect-new-miami-star-brings-big-business-mls.

[6] *Id.*





*Examples of Genuine MESSI Products Bearing the MESSI Trademark*

9.      Since at least 2016, the MESSI Trademark is and has been the subject of substantial and continuous marketing and promotion by Plaintiffs. Plaintiffs have and continue to widely market and promote the MESSI Trademark in the industry and to consumers. Plaintiffs' promotional efforts include—by way of example but not limitation—significant online advertising and marketing campaigns, including through official MESSI websites and online stores;

4

authorized and licensed retail partners such as Adidas; and official MESSI Store social media channels, including Instagram and Facebook, as well as other digital and commercial platforms.

10.     Plaintiffs have expended substantial time, money, and other resources in advertising and otherwise promoting the MESSI Trademark as well as the MESSI Products. As a result, products bearing the MESSI Trademark are widely recognized and exclusively associated by consumers, the public, and the trade as being products sourced from Plaintiffs.

11.     The success of the MESSI Products has resulted in significant counterfeiting as well as a flood of counterfeit products in the market. Consequently, Plaintiffs have implemented an anti-counterfeiting and infringement deterrent program and are investigating suspicious websites and online marketplace listings identified in proactive internet sweeps as part of that program. Plaintiffs have identified numerous domain names linked to fully interactive websites and marketplace listings on platforms including but not limited to AliExpress, DHgate, Etsy, Shein, Temu, and Walmart (the "Marketplace Platforms").

12.     Through Plaintiffs' investigation, we have learned of Defendants' sale of products on at least the Marketplace Platforms that appear to be genuine MESSI Products, but which are actually inferior and unauthorized imitations of the MESSI Products (the "Counterfeit Products"). Indeed, the Counterfeit Products are strikingly similar, or at the very least substantially similar, to the MESSI Products and/or are marketed by reference to a mark identical or substantially identical to the MESSI Trademark.

13.     The Defendants' online marketplace pages on the Marketplace Platforms, identified in Schedule A ("Defendant Internet Stores") share unique identifiers, such as design elements and similarities of the counterfeit products offered for sale, establishing a logical relationship between

them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences.

14.    Despite Plaintiffs' enforcement efforts online, Defendants have persisted in creating the Defendant Internet Stores and engaging in continued sales of the Counterfeit Products.

15.    For example, to date, Plaintiffs' investigation of Defendants reveals that Defendants are using the Defendant Internet Stores to sell Counterfeit Products from foreign countries such as China (and elsewhere) to consumers in the United States, including consumers in New York.

16.    I have directly (or someone working under my supervision has) analyzed each of the Defendant Internet Stores and determined that Counterfeit Products were being offered for sale to the United States, including New York.

17.    This conclusion was reached through visual inspection of the products listed for sale on the website, and we confirmed:

a.    The Counterfeit Products are strikingly similar, or at the very least substantially similar to the MESSI Products and/or are marketed by reference to a mark identical or substantially identical to the MESSI Trademark;

b.    Each Defendant Internet Store accepts payment in U.S. dollars;

c.    We attempted to initiate the purchase process of a Counterfeit Product from each of the Defendant Internet Stores, and each Defendant allows products to be shipped to the Southern District of New York.

18.    True and correct copies of screenshot printouts showing examples of the active Defendant Internet Stores, as well as pages confirming the ability to order and ship Counterfeit Products to New York, are collectively attached as **Exhibit 2**.

19.    Defendants do not conduct business with Plaintiffs and do not have the right or authority to use the MESSI Trademark for any reason. Plaintiffs have not licensed or authorized Defendants to use the MESSI Trademark. I have no reason to believe that any of the Defendants are authorized retailers of genuine MESSI Products.

20.    Upon information and belief, defendants like Defendants in this case regularly rely on and use the e-mail addresses that Defendants provide to the Marketplace Platforms and other third-party payment processers in order to communicate concerning monies received through the Defendant Internet Stores. Thus, obtaining such e-mail addresses from the Marketplace Platforms and third-party payment processers is often times the fastest and most direct way to get into contact with individuals and entities like Defendants that are engaged in the sale of counterfeit products.

21.    Upon information and belief, Defendants typically facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine MESSI Products. Many of the Defendant Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards, Western Union, Amazon, eBay, and PayPal.

22.    The Defendant Internet Stores often include images and design elements that make it very difficult for consumers to distinguish such counterfeit sites from an authorized website.

23.    Upon information and belief, Defendants also typically deceive unknowing consumers by using the MESSI Trademark without authorization within the content of their web sites (including by advertising the Counterfeit Products and their embodying the MESSI

Trademark) in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for the MESSI Products. Additionally, Defendants typically use other unauthorized search engine optimization ("SEO") tactics and social media spamming so that the Defendant Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for genuine MESSI Products. Further, Defendants typically utilize similar illegitimate SEO tactics to propel new domain names to the top of search results after others are shut down.

24.    Upon information and belief, Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their massive network of Defendant Internet Stores. For example, many of Defendants' listed names and physical addresses are incomplete. Defendant Internet Stores regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by Defendants to conceal their identities, the full scope and interworking of their massive counterfeiting operation, and to avoid being shut down.

25.    Even though Defendants operate under multiple fictitious names, there are numerous similarities among the Defendant Internet Stores. For example, the Counterfeit Products for sale in the Defendant Internet Stores bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated.

26.    In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new

online marketplace accounts under new aliases once they receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring take down demands sent by brand owners. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.

27.     Based on my experience in investigating counterfeit products, including the instant investigation, counterfeiters such as Defendants typically operate multiple credit card merchant accounts as well as Amazon, eBay, PayPal, and other third-party payment processing accounts behind layers of payment gateways so that they can continue operation in spite of Plaintiffs' enforcement efforts. Further, Defendants typically maintain offshore bank accounts and regularly move funds from their Amazon, eBay, PayPal, and other third-party payment processing accounts to offshore bank accounts outside the jurisdiction of this Court.

28.     Monetary damages cannot adequately compensate Plaintiffs for ongoing infringement because monetary damages fail to address the damage to the Plaintiffs' control over their intellectual property rights, reputation, associated goodwill, and ability to exploit their intellectual property rights. Furthermore, monetary damages are difficult, if not impossible, to ascertain due to the inability to calculate measurable damage in dollars and cents caused by acts of infringement to Plaintiffs' control over their intellectual property rights, reputation, the goodwill associated therewith, and ability to exploit their intellectual property rights.

29.     Plaintiffs' goodwill and reputation are irreparably damaged by the making, using, offering for sale, selling, or importing of goods that infringe the MESSI Trademark. Moreover, consumer brand confidence is damaged, which can result in a loss of future sales and market share.

The extent of harm to Plaintiffs' reputation and goodwill and the possible diversion of customers due to loss of brand confidence are largely unquantifiable.

30. Plaintiffs are further irreparably harmed by the unauthorized making, using, offering for sale, selling, or importing of goods that infringe the MESSI Trademark because infringers take away Plaintiffs' ability to control the nature and quality of the Counterfeit Products. Loss of quality control over goods made, used, offered for sale, sold, or imported featuring the MESSI Trademark and loss of control over the Plaintiffs' reputation is neither calculable nor precisely compensable.

31. The sale of Counterfeit Products bearing and/or embodying the MESSI Trademark causes consumer confusion, which weakens the Plaintiffs' brand recognition and reputation. Consumers who mistakenly believe that the Counterfeit Products they have purchased originated from Plaintiffs will come to believe that Plaintiffs offer low-quality products. Inferior quality products will result in increased skepticism and hesitance among consumers presented with genuine MESSI Products, resulting in a loss or undermining of Plaintiffs' reputation and goodwill. Counterfeit Products, primarily coming from China, can also be extremely dangerous and present alarming safety hazards to children.

32. Plaintiffs are further irreparably damaged due to a loss of exclusivity. MESSI Products are meant to be exclusive. Plaintiffs' extensive marketing efforts and innovative designs are aimed at growing and sustaining sales of the MESSI Products. The MESSI Trademark signifies to consumers that the MESSI Products originate from Plaintiffs and are manufactured to high quality standards. When counterfeiters make, use, offer for sale, sell, or import goods using the MESSI Trademark without Plaintiffs' authorization, the exclusivity of the MESSI Products and Plaintiffs' reputation are damaged and eroded, resulting in a loss of unquantifiable future sales.

33.    Plaintiffs will suffer immediate and irreparable injury, loss, or damage if an *ex parte* Temporary Restraining Order is not issued.

I declare under penalty of perjury under the laws of the United States of America the foregoing is true and correct.

Executed on 23 February, 2026 in Escaldes-Engordany.

_____
DOMINIK FOURNÉ

11